## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SANDOZ INC.,<br><br>100 College Road West, Princeton,<br>New Jersey 08540<br><br>   Plaintiff,<br><br>-vs-<br><br>LANNETT COMPANY, INC.<br><br>9000 State Road, Philadelphia,<br>Pennsylvania 19136<br><br>   Defendant. | DOCKET NO.  20cv3538<br><br>   Civil Action<br><br>   **COMPLAINT** |

Plaintiff Sandoz Inc. ("**Sandoz**" or "**Plaintiff**"), by and through its undersigned counsel, as and for its Complaint against Defendant Lannett Company, Inc. ("**Lannett**" or "**Defendant**"), alleges as follows:

### NATURE OF THE CASE

1. Defendant pharmaceutical company Lannett has interfered with Sandoz's long-standing exclusive right to market and distribute manufacturer Cediprof, Inc.'s ("**Cediprof**") levothyroxine sodium tablets ("**Levothyroxine**" or "**Product**"), a drug used to treat hypothyroidism, in the United States and certain territories, and with Sandoz's relationships with its customers.  This action for tortious interference with contract and with business relationships arises from Lannett's wrongful conduct in the marketplace.

2. Pursuant to the Agreement for Marketing and Distribution of Products, dated July 31, 2002, as amended ("**Agreement**"), between Sandoz and Cediprof, Sandoz has the exclusive right to market, distribute, and sell Cediprof's Levothyroxine in the United States and certain territories.  Under the Agreement, Cediprof must exclusively supply Sandoz with its

1

requirements for Levothyroxine.  In June 2020, with more than two years remaining in the

contractual term, Cediprof made a baseless attempt to terminate the Agreement in order to

partner with Lannett.  Notably, Lannett agreed to pay Cediprof significant amounts of money

upfront to acquire the Product rights and even to subsidize Cediprof's expenses for litigation

against Sandoz.  As a result, Sandoz has suffered and will continue to suffer damages in the form

of lost profits and customer penalties and harm to its reputation in the marketplace due to

misrepresentations by Lannett and/or Cediprof and their respective agents.  Sandoz also is in

imminent danger of being unable to fill customer orders, disrupting the supply of an important

treatment for a prevalent disease affecting a large number of patients who could be adversely

affected by having to switch formulations of the drug if supply of Cediprof Levothyroxine must

be abandoned for a more reliable alternative.[1]

3.      For nearly seventeen years, Sandoz has been the exclusive distributor of

Cediprof's Levothyroxine in the United States.  Levothyroxine has been a staple in Sandoz's line

of products and in 2019 generated tens of millions of dollars in revenue.  Sandoz has also

expended significant time and resources for the marketing and distribution of Levothyroxine

through July 31, 2022, when the Agreement is scheduled to terminate by its own terms.

4.      On June 19, 2020, however, Cediprof wrongfully purported to terminate the

Agreement, notwithstanding the parties' longstanding relationship and the Agreement's

termination and cure requirements.  As a pretense for termination, Cediprof fabricated claims

that Sandoz defaulted, citing to alleged obligations that appear *nowhere* in the Agreement.

Ironically, underlying one of the purported breaches was Cediprof's complaint that Sandoz sold

---

[1] About 4.6 percent of the U.S. population ages 12 and older has hypothyroidism.  In certain cases, changing
hypothyroid medication involves going to testing centers to have thyroid hormone levels verified before switching to
another product.

too much Levothyroxine, meeting increased demand during the unprecedented COVID-19 pandemic. Cediprof also asserted that Sandoz obstructed Cediprof's right to conduct an audit of Sandoz's books and records, when in reality, Sandoz worked diligently with Cediprof's auditor and reached an agreement with the auditor regarding the scope of the audit. Despite the 90-day cure period required by the Agreement, 51 days later Cediprof unilaterally decided, without any explanation, that these purported defaults were "uncurable" and notified Sandoz that it was terminating the Agreement.

5.      The apparent motivation behind Cediprof's breach and wrongful termination of the Agreement is to effect a deal it entered into more than a year ago to transfer Levothyroxine to Lannett, in violation of Sandoz's exclusivity rights. Upon information and belief, Lannett induced Cediprof to terminate the Agreement in order to transfer Sandoz's exclusive rights to Lannett and begin distributing Levothyroxine by August 1, 2020.

6.      Sandoz does not have access to complete information concerning Cediprof's and Lannett's conduct, but if Lannett is planning to begin shipping by August 1, 2020, it was engaging in activity in support of the marketing, distribution, and sale of the Product for some time before June 19, 2020. On July 16, 2020, Cediprof confirmed this fact when it admitted publicly that it has "been building inventory" of Levothyroxine manufactured under the Lannett label. Upon information and belief, this violation of Sandoz's exclusivity has been ongoing for some time. Levothyroxine has a three-month lead-time. If Cediprof has built its inventory of Lannett-branded stock as of today, then it has been manufacturing under the Lannett label since at least April 2020—not coincidentally, the same month Cediprof notified Sandoz of its purported "defaults." Cediprof's inventory build for Lannett must have been done in concert with Lannett, in furtherance of their scheme to move Levothyroxine away from Sandoz.

3

7.      Upon information and belief, Lannett was further incentivized to acquire Sandoz's rights to Levothyroxine after Lannett lost its exclusivity to one of its largest products, fluphenazine, on July 9, 2020.  Acquiring Levothyroxine allows Lannett to make up for this loss.

8.      In the same stroke, Lannett would bar Sandoz from the levothyroxine sodium tablets market for four years, under the Agreement's provision for a non-compete period following Cediprof's termination of the Agreement for cause.  This is a clear attempt by Lannett to manipulate the number of competitors in the market.

9.      Further, a termination for cause also deprives Sandoz of the advanced notice it would have been entitled to receive in advance of a non-renewal at the natural end of the contractual term.  Such notice periods are crucial in the highly-regulated pharmaceuticals industry, where development times for generic drugs can be significant.

10.      As a result of Cediprof's wrongful termination of the Agreement, as induced by Lannett, Sandoz estimates it will lose tens of millions of dollars in profits that it would have received from the exclusive distribution of Levothyroxine through July 31, 2022.

11.      In contrast, Lannett's stock price rose from a low of $4.90 on July 14, 2020 to a high of $6.23 on July 16, 2020—an increase in market cap from $197.72M to $251.38M, or $53.7M.  This was despite Lannett's own loss of its market exclusivity on another product, generic fluphenazine, only a few days prior, which demonstrates the significance of Levothyroxine as a product and casts light on Lannett's motives in timing its own announcement of a Levothyroxine deal with Cediprof.[2]

---

[2] Lannett stated in its July 13, 2020 press release that it "expected pricing pressure in fiscal 2021 on certain key products, including generic Fluphenazine, currently our largest revenue product and one that has higher than average gross margins. A competitor has recently received approval for this product and we believe will launch shortly." *Lannett Announces Restructuring, Cost Reduction Initiatives* (July 13, 2020), *available at* https://lannett.investorroom.com/2020-07-13-Lannett-Announces-Restructuring-Cost-Reduction-Initiatives.

12.     Sandoz's goodwill and reputation in the marketplace have also been damaged. Sandoz has discovered that Lannett contacted Sandoz's customers and informed them that it is now Cediprof's exclusive distributor for Levothyroxine, that Sandoz's rights to the Product have been impaired, and that these customers should enter non-disclosure agreements with the company in order to begin pricing negotiations to start shipping by August 1, 2020.  In response, Sandoz sent a cease and desist letter to Lannett, demanding that it immediately cease its contact with Sandoz's customers and highlighting that their actions violated Sandoz's existing exclusive agreement with Cediprof.

13.     As a further result of Lannett's conduct, Sandoz projects that it will imminently be unable to fill outstanding customer orders for certain Levothyroxine dosages.  If that occurs, Sandoz will be subject to "failure to supply" penalties under its agreements with its customers.

14.     And patients who rely on Sandoz Levothyroxine, who may be unable or reluctant to visit their doctors during the COVID-19 pandemic, could have their treatments disrupted.[3,4]

15.     This action seeks injunctive relief and damages, including but not limited to, compensatory damages caused by Lannett's tortious interference with Sandoz's contractual relations and unfair competition, and any further relief that the Court deems just and fair.

---

[3] Doctors' visits for non-coronavirus-related care, including both emergency and preventative care, are down due to fear of exposure risk at healthcare settings and confusion about what constitutes an "elective" procedure. *See, e.g.*, Will Feuer, *Doctors worry the coronavirus is keeping patients away from US hospitals as ER visits drop: 'Heart attacks don't stop'*, CNBC (April 14, 2020), *available at* https://www.cnbc.com/2020/04/14/doctors-worry-the-coronavirus-is-keeping-patients-away-from-us-hospitals-as-er-visits-drop-heart-attacks-dont-stop.html; Elizabeth Pratt, *Excess Deaths: People Who Are Dying Because of COVID-19 — but Not from It*, Healthline (May 5, 2020), *available at* https://www.healthline.com/health-news/excess-deaths-from-covid19-pandemic; Elizabeth Lawrence, *Nearly Half of Americans Delayed Medical Care Due to Pandemic*, Kaiser Health News (May 27, 2020), *available at* https://khn.org/news/nearly-half-of-americans-delayed-medical-care-due-to-pandemic/.
[4] Levothyroxine is a narrow therapeutic index drug, which means patients are very sensitive to changes in their treatment regimen.  Wartofsky, Leonard, *Levothyroxine: therapeutic use and regulatory issues related to bioequivalence*, Expert Op. on Pharmacotherapy Vol. 3,6 (2002), *available at* https://pubmed.ncbi.nlm.nih.gov/12036412/#affiliation-1.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this dispute under 28 U.S.C.

§ 1332(c) because the parties are citizens of different states and the amount in controversy

exceeds $75,000, exclusive of interest and costs.

17.     Venue is proper pursuant to 28 U.S.C. 1391(b) because Lannett maintains its

principal place of business in this district.

## PARTIES

18.     Plaintiff Sandoz Inc. is a corporation organized under the laws of the state of

Colorado and has its principal place of business at 100 College Road West, Princeton, New

Jersey, 08540.  Sandoz was formerly known as Geneva Pharmaceuticals, Inc. and began

conducting business under the name Sandoz on December 1, 2003.  Sandoz manufactures,

markets, and distributes generic pharmaceuticals and biosimilars.

19.     Defendant Lannett Company, Inc. is a corporation organized under the laws of the

state of Delaware and has its principal place of business at 9000 State Road Philadelphia, PA.

Lannett manufactures, markets, and distributes pharmaceuticals.

## FACTS COMMON TO ALL COUNTS

20.     Pursuant to the Agreement, Cediprof granted Sandoz the "exclusive right to sell,

market and distribute [Levothyroxine] in the Territory during the term of this Agreement . . .

[and] the rights under the Product's NDA Supplements and/or ANDA's . . . ."  The Agreement

also provides that Cediprof "shall make every reasonable effort to manufacture, package and

deliver the Product so that [Sandoz's] requirements are met."

21.     Since the early 2000s, Sandoz has marketed and distributed Levothyroxine to

customers in the United States.

22.     In 2019, Levothyroxine generated tens of millions in sales and pre-tax profits for Sandoz.

23.     Sandoz has performed its obligations under the Agreement by making full and timely payments to Cediprof for the shipments of Levothyroxine.

24.     Sandoz has actively marketed, supplied and distributed Levothyroxine using commercially reasonable marketing and promotional strategies.

25.     The Agreement had an initial term of fifteen years, which would automatically renew until either party terminated the Agreement by delivery of twenty-four months advance written notice.  Pursuant to the Amendment to Marketing and Distribution Agreement, dated October 14, 2014, the parties extended the term of the Agreement for another five years, through July 31, 2022, and provided the Agreement would automatically renew for consecutive one-year renewal terms unless a party provided six months' advance notice that it did not wish to renew.

26.     Sandoz has contracts in place with customers, including Customer A, Customer B, and Customer C to supply Levothyroxine, and is ready, willing, and able to continue to market, supply, and distribute Levothyroxine for the duration of the Agreement, through July 31, 2022.[5]  Cediprof had Sandoz's customer list and information regarding the volumes of sales for each customer—which was confidential information under its agreement with Sandoz—and was in a position to provide that information to Lannett.  Lannett would have been able to calculate Sandoz's pricing from this information.

---

[5] Sandoz's agreements with Customers A, B, and C include confidentiality provisions that require Sandoz to provide notice to the customer if it discloses any information regarding the agreement to third parties.  Sandoz is in the process of notifying Customers A, B, and C of this emergency action and obtaining consent to disclose their identities in the action.

I.      **Lannett Induced Cediprof to Breach the Agreement in Order to Get Levothyroxine**
        **Away from Sandoz and Under Lannett's Control.**

27.     Lannett induced Cediprof to end the Agreement long before its natural

termination.  On or about July 3, 2019, while the Agreement was in place, Cediprof entered into

a publicly-disclosed distribution and supply agreement with Lannett for the same product

underlying the Cediprof-Sandoz Agreement—Levothyroxine—and covering the same United

States territory (the "**Lannett Agreement**").[6]  Lannett paid Cediprof $20 million up front for

these rights, and could only obtain a return on its investment by launching Levothyroxine—the

earlier, the better.  Sandoz learned about the Lannett Agreement after Lannett publicly disclosed

it to the Securities Exchange Commission on July 8, 2019.

28.     Therefore, under the Lannett Agreement, Cediprof and Lannett agreed their

distribution and supply agreement would become effective no later than August 1, 2022, but also

agreed to work together to get the Product away from Sandoz, with Lannett agreeing to

"reimburse Cediprof for thirty percent (30%) of legal fees incurred by Cediprof in connection

with any engagement with the current distributor [Sandoz] regarding transition or termination of

the current distribution agreement."[7]

29.     On July 17, 2019, Sandoz sent Cediprof a notice of assignment of the Agreement

to Eon Labs Holdings (an affiliate of Sandoz) and the subsequent transfer of control of that entity

to Aurobindo Pharma U.S.A. ("**Aurobindo**") as part of a proposed sale of Sandoz's United

States oral solid and dermatology business to Aurobindo.  This notice was consistent with

---

[6] A publicly-filed version of the Lannett Agreement is available at
https://www.sec.gov/Archives/edgar/data/57725/000110465919061154/a19-
18200_1ex10d58.htm#Exhibit10_58_045115
[7] Lannett Agreement **§** 2.02(a).

Sandoz's obligations under the Agreement's assignment provision.  Notably, the Agreement explicitly allowed Sandoz to assign the Agreement to an affiliate.

30.     Senior executives from Cediprof informed Sandoz that they would refuse to do business with Aurobindo in any context, but would not offer Sandoz any specific reasoning for this view despite multiple attempts by Sandoz to understand their concerns.  Indeed, Aurobindo stood to become one of the largest generics companies in the United States if the deal had closed. It is now clear that Cediprof's recalcitrance was due to its arrangement with Lannett.

31.     In the first quarter of 2020, Sandoz attended a meeting during which Lannett proposed negotiating the potential early transfer of its rights in Levothyroxine to Lannett. Lannett offered to acquire the rights to Levothyroxine early, but Sandoz declined Lannett's offer due to its commitment to transfer the business to Aurobindo.

32.     In early April 2020, however, Sandoz and Aurobindo announced the cancellation of their transaction involving Eon Labs Holdings, which also meant there would no longer be an assignment of the Agreement to Eon Labs Holdings.  On or about April 6, 2020, Sandoz informed Lannett and Cediprof that the Aurobindo transaction would not go forward and, as a result, Sandoz would continue as before, under the Agreement, without this assignment.

**A.     Cediprof Wrongfully Terminated the Agreement.**

33.     Shortly after Sandoz informed Cediprof that it would continue as normal under the Agreement, Cediprof and Lannett began an overt campaign to terminate the Agreement in favor of the Lannett arrangement.  On April 29, 2020, Cediprof sent Sandoz a purported notice asserting two "defaults" under the Agreement related to Sandoz's inventory levels and Cediprof's audit rights (the "**April 29th Letter**").  Neither default had a basis in either fact or the contract.

34.    In the April 29th Letter, Cediprof fabricated claims that Sandoz defaulted, citing alleged obligations related to inventory levels and the manner of audits that appear *nowhere* in the Agreement.  Ironically, underlying one of the purported breaches was Cediprof's complaint that Sandoz sold too much Levothyroxine, meeting increased demand during the unprecedented COVID-19 pandemic.

35.    Specifically, in the April 29th Letter, Cediprof alleged that: (1) Sandoz had breached the Agreement by failing to increase its inventory level to double what it maintained; and (2) Sandoz breached a provision of the Agreement regarding Cediprof's right to audit Sandoz's books and records.

36.    With regards to the first allegation, the provision of the Agreement that Cediprof cited in support of its claim governs marketing and promotional strategies that Sandoz is required to use.  It does not govern any specific level of inventory Sandoz is required to keep.  Rather, the Agreement contains a separate, specific provision requiring Sandoz only to keep sufficient inventory to maintain its level of sales—a standard that Sandoz has met.

37.    With regards to the second allegation, the provision of the Agreement that Cediprof cited in support of its claim provides Cediprof the right to audit Sandoz's book and records, but does not specify the manner in which the audit take place.  Following Cediprof's request for an audit, Sandoz was working with Cediprof's auditor to define a reasonable scope of the audit and to schedule the examination during a pandemic.  Indeed, these efforts continued even after Cediprof sent its breach notice, and Sandoz and Cediprof's auditor have since reached an agreement on the scope of the audit, which is being scheduled.

38.    On May 4, 2020, Sandoz confirmed receipt of the April 29th Letter and informed Cediprof that it would revert in due course.

10

39.     Nevertheless, on June 19, 2020, 51 days after it sent the April 29th Letter, Cediprof notified Sandoz that it was terminating the Agreement for cause effective July 31, 2020, "[b]ecause these breaches cannot be remedied within a ninety day period, and because Sandoz has not diligently commenced or diligently pursued any remedy to these breaches in the six weeks since the Notice of Default was sent" and that it would not be filling June orders Sandoz previously placed ("**June 19th Letter**").

40.     Cediprof's assertions in the June 19th Letter that the alleged breaches "cannot be remedied within a ninety day period" and that "Sandoz has not diligently commenced or diligently pursued any remedy to these breaches" were clearly false pretexts for terminating the Agreement.  There were no actual breaches, but even if there had been, these "defaults" could have easily been remedied.  Rather, Cediprof had already laid the groundwork for transfer to Lannett and wanted to move that process forward.  When Sandoz made it clear there was no interest in changing the terms of the Agreement, Cediprof concocted the allegations of default so that Lannett could begin marketing the Product as early as August 1, 2020, as Cediprof and Lannett had been planning to do.

41.     By taking these actions, Cediprof failed to comply with the Agreement's 90-day cure period for any alleged defaults, failed to engage in the dispute resolution process agreed upon, and failed to meet its supply obligations by cancelling the June orders.

42.     Sandoz has been damaged as a result of Cediprof's wrongful termination of the Agreement and disclosure of confidential information, and has filed a confidential arbitration against Cediprof regarding this contractual dispute.  Sandoz now has a dwindling inventory of the Product and is in imminent danger of being unable to fill existing customer orders.

**B.**     **Lannett Induced Cediprof to Terminate the Agreement Early.**

43.     It is now clear that Cediprof fabricated the purported defaults as a pretext to terminate the Agreement so that Lannett could begin marketing and supplying the Product as early as August 1, 2020, under the agreement between Cediprof and Lannett.

44.     Indeed, immediately prior to the April 29th Letter, Lannett proposed an arrangement whereby Sandoz would transfer its distribution rights to Lannett—an offer that Sandoz rejected.

45.     It is also now clear that production of Lannett-branded Levothyroxine was underway at least since April 2020, in light of Cediprof's announcement on July 16, 2020 that it had already accumulated Lannett-branded inventory.

46.     After Sandoz rejected Lannett's offer, Cediprof and Lannett—clearly having already laid the groundwork to transfer rights to Lannett in 2020—took a different tack.  They decided to concoct alleged "defaults" as grounds to terminate the Agreement, so that Lannett could continue to ramp up to begin marketing the Product early.  Cediprof sent Sandoz the April 29th Letter shortly thereafter.

47.     Having had the marketing and distribution agreement in place since July 2019, Cediprof and Lannett, on information and belief, had already taken steps by June 2020 allowing Lannett to ramp up to begin marketing Levothyroxine as early as August 1, 2020.  These steps, upon information and belief, took place before, during, and after Cediprof sent its notices of breach and termination to Sandoz.

48.     Upon information and belief, Lannett provided Cediprof with all Lannett labeling and trademarks and Lannett NDC codes necessary to allow Cediprof to manufacture Levothyroxine on Lannett's label because Levothyroxine has a three-month lead-time, and Lannett purportedly plans to start distribution of Levothyroxine by August 1, 2020.  Lannett even

12

made a public announcement to this effect on July 16, 2020, after which its stock price jumped from 5.14 to 6.23, an increase of 21%—yet another incentive Lannett had to induce Cediprof's breach.

49.     Moreover, Lannett anticipated that Cediprof would terminate the Agreement early—the Lannett Agreement includes a provision whereby Lannett agreed to cover 30% of Cediprof's fees in litigating the termination of the Agreement with Sandoz.  This clause by itself demonstrates that Lannett and Cediprof intended to and anticipated making efforts to disrupt Sandoz's contractual rights and customer relationships.

50.     Upon information and belief, Lannett was further incentivized to acquire Sandoz's rights to Levothyroxine when Lannett lost exclusivity over one of its largest products, fluphenazine, with the entry of competitor Amneal into the generics market on July 9th, 2020.  This event caused a significant drop in Lannett's stock price and market capitalization.  Acquiring Levothyroxine would allow Lannett to make up for this loss.

51.     Upon information and belief, Cediprof and Lannett were further motivated to fabricate a breach of Cediprof's Agreement with Sandoz to create a four-year period where Sandoz would be barred from the levothyroxine sodium tablets market.  By inducing a termination for cause, Lannett seeks to create a four-year period where one of its main competitors, Sandoz, is unable to compete on the levothyroxine sodium tablets market.

52.     The Agreement also includes a requirement for notice of non-renewal before the natural end of its term, which is necessary to ensure that Sandoz can obtain a different source of Levothyroxine.  In the highly regulated pharmaceuticals industry such notice periods are vital, as development times for generic drugs can be significant.  As a consequence of Cediprof's

wrongful termination for "cause," at minimum Sandoz was deprived of the notice it would have received in advance of a non-renewal.

II.     **Lannett Has Already Contacted Sandoz's Customers to Convince Them to End Their Business Relationships with Sandoz.**

53.     Lannett not only induced Cediprof improperly to terminate the Agreement early; it has already contacted Sandoz's customers to inform them that it is now the exclusive distributor of Levothyroxine, sowing discord and confusion among Sandoz's customers and damaging Sandoz's goodwill and reputation in the marketplace.

54.     On June 26, 2020, Marco Monrouzeau, Chief Financial Officer of Cediprof, wrote to Sandoz and stated Cediprof "will begin the process of customer outreach next week so that we can ensure continuity and an orderly transition."

55.     Cediprof had obtained Sandoz's customer list and information regarding the volumes of sales for each customer during its long-standing relationship with Sandoz.  Upon information and belief, any customer outreach by Marco Monrouzeau or his agents was based in whole in or part on that confidential and proprietary information.

56.     Upon information and belief, Cediprof divulged to Lannett Sandoz's customer lists, information regarding Sandoz's product volumes and customer orders, among other confidential information, without Sandoz's consent.

57.     Following this announcement, Lannett began taking actions to harm Sandoz's relationships with its clients, engaging in dishonest, unfair, and improper conduct through the wrongful means of making misrepresentations and exerting unfair economic pressure on these customers.

58.     Sandoz has learned from its customers, Customer A, Customer B, and Customer C, that as early as June 30, 2020, they had been contacted by a company, presumably Lannett,

14

which claimed to hold distribution rights with Cediprof.  The company represented to the customers that Sandoz's rights to Levothyroxine had been impaired.

59.     On June 30, 2020, Customer A informed Sandoz that another supplier had contacted it regarding the distribution of Levothyroxine.  The supplier asserted it was in partnership with Cediprof and that Sandoz's rights to distribute the Product had been impaired.

60.     On July 2, 2020, Sandoz issued a cease and desist letter to Lannett, demanding that Lannett stop any contact with Sandoz's customers.

61.     Despite the cease and desist letter, on July 7, 2020, Customer B informed Sandoz that a supplier had contacted it regarding the distribution of Levothyroxine and requested that Customer B sign a nondisclosure agreement in order to begin negotiations on price and to start shipping the Product by August 1, 2020.  The fact that Lannett requested a nondisclosure agreement demonstrates that Lannett knows customer supply and pricing information is highly confidential.

62.     On July 9, 2020, Customer C informed Sandoz that Lannett had contacted it and stated that Lannett would be taking over distribution of Levothyroxine.  Customer C wrote: "I heard from Lannett that they will be taking over your Levothyroxine in the next few weeks."

63.     Upon information and belief, Lannett and/or Cediprof have directly communicated with Sandoz's customers in an attempt to cast doubt on Sandoz's ability to supply products reliably and to interfere with Sandoz's broader standing in the marketplace.

## FIRST CAUSE OF ACTION

### (Tortious Interference with Contractual Relations)

64.     Sandoz incorporates by reference the allegations in paragraphs 1 through 63 above.

65.     On July 31, 2002, Cediprof, as successor by merger to Alara Pharmaceutical

Corp., entered into the Agreement with Sandoz, as successor to Geneva Pharmaceuticals, Inc.,

which is a valid, lawful, and enforceable contract.

66.     Lannett acknowledged the existence of the Agreement by, *inter alia*, agreeing that

its distribution and supply agreement with Cediprof would begin on August 1, 2022, following

the termination of the Cediprof-Sandoz Agreement.

67.     Lannett has intentionally and improperly induced Cediprof's breach of the

Agreement by entering into the Lannett Agreement with Cediprof for the same distribution and

marketing rights to Levothyroxine, agreeing to cover part of Cediprof's fees to litigate the

termination of the Agreement, and working with Cediprof to concoct alleged defaults in order to

expedite Lannett's ability to distribute Levothyroxine.

68.     Upon information and belief, Lannett has already engaged in improper activities

to prepare to distribute Levothyroxine by August 1, 2020, in violation of Sandoz's exclusive

rights under the Agreement.  Such improper activities include Cediprof's manufacture of

Levothyroxine under Lannett's label.  Such improper activities also include contacting Sandoz's

customers prior to the termination of the Agreement to begin price and supply negotiations.

69.     Lannett's improper actions in inducing Cediprof to breach the Agreement were

undertaken in the absence of privilege and with no justification whatsoever.

70.     As described in more detail above, and as a result of Lannett's actions, Cediprof

has breached its obligations under the Agreement by failing to perform as required.  For

example:

a.      Cediprof wrongfully terminated the Agreement;

b.　Cediprof breached the Agreement by failing to allow 90 days for Sandoz to cure the purported defaults;

c.　Cediprof breached the Agreement by failing to comply with the dispute resolution procedures set forth in the Agreement;

d.　Cediprof breached its obligations under the Agreement by taking steps that impair Sandoz's exclusive rights to effect a contract previously entered with Lannett to market and distribute the same product; and

e.　Cediprof breached its obligations by canceling certain June 2020 orders.

71.　Sandoz has suffered damages in an amount to be determined at trial, including but not limited to lost profits that Sandoz would have received from the exclusive distribution of Levothyroxine through July 31, 2022, penalties from "failure to supply" provisions in customer agreements, and harm to Sandoz's goodwill and reputation.

## SECOND CAUSE OF ACTION

### (Tortious Interference with Contractual Relations)

72.　Sandoz incorporates by reference the allegations in paragraphs 1 through 71 above.

73.　On July 31, 2002, Cediprof, as successor by merger to Alara Pharmaceutical Corp., entered into the Agreement with Sandoz, as successor to Geneva Pharmaceuticals, Inc., which is a valid, lawful, and enforceable contract.

74.　The Agreement provides Sandoz with exclusive distribution and marketing rights for Levothyroxine.

75.　Sandoz has been the exclusive distributor of Cediprof's Levothyroxine in the United States for nearly seventeen years, and Levothyroxine has been a staple in Sandoz's line of products during that time.

17

76.     Sandoz has expended significant time and resources for the marketing and distribution of Levothyroxine through July 31, 2022, when the Agreement is scheduled to terminate by its own terms.

77.     Lannett knew that Sandoz distributes Levothyroxine to customers in the United States, including those mentioned above, and that Sandoz has contracts with its customers to supply Levothyroxine.  The relationships with these customers are likewise valid, advantageous, profitable business relationships that have an expectancy to continue.

78.     Upon information and belief, however, as early as July 1, 2020, Lannett contacted Sandoz's customers, claiming to hold distribution rights with Cediprof, and informing them that Sandoz's rights to Levothyroxine had been impaired.

79.     Upon information and belief, Lannett requested in some instances that Sandoz's customers sign a nondisclosure agreement in order to begin negotiations on price and to start shipping by August 1, 2020.

80.     Upon information and belief, Lannett directly communicated and intentionally interfered with Sandoz's customers in an attempt to cast doubt on Sandoz's ability to supply products reliably and interfere with Sandoz's broader standing in the marketplace.

81.     Lannett's interference with Sandoz's customers has caused injury to the relationship between Sandoz and its customers.

82.     Sandoz has suffered damages resulting from Lannett's interference with its customers, including but not limited to damage to Sandoz's goodwill and reputation, and may cause it to lose other business with those customers in an amount to be determined.

### THIRD CAUSE OF ACTION

**(Unfair Competition)**

83.      Sandoz incorporates by reference the allegations in paragraphs 1 through 82 above.

84.      Lannett knew of and interfered with Sandoz's Agreement with Cediprof for exclusive distribution and marketing rights for Levothyroxine.

85.      Sandoz has been the exclusive distributor of Cediprof's Levothyroxine in the United States for nearly seventeen years, and Levothyroxine has been a staple in Sandoz's line of products during that time and has a valid, advantageous, profitable business relationship with Cediprof, and an expectancy that the relationship and its mutual benefits would continue.

86.      Lannett acknowledged the existence of the Agreement by, *inter alia*, agreeing that its distribution and supply agreement with Cediprof would begin on August 1, 2022.

87.      Lannett induced Cediprof to fabricate defaults to wrongfully terminate the Agreement and disregard the Agreement's cure and dispute resolution provisions so that Lannett could directly benefit by commencing distribution of Levothyroxine by August 1, 2020.

88.      Lannett knew that Sandoz distributes Levothyroxine to customers in the United States, including those mentioned above, and that Sandoz has contracts with its customers to supply Levothyroxine.  The relationships with these customers are likewise valid, advantageous, profitable business relationships that have an expectancy to continue.

89.      Upon information and belief, however, as early as June 30, 2020, Lannett contacted Sandoz's customers, claiming to hold distribution rights with Cediprof, and informing them that Sandoz's rights to Levothyroxine had been impaired.

90.     Upon information and belief, Lannett requested in some instances that Sandoz's customers sign a nondisclosure agreement in order to begin negotiations on price and to start shipping by August 1, 2020.

91.     Upon information and belief, Lannett directly communicated with Sandoz's customers in an attempt to cast doubt on Sandoz's ability to supply products reliably and interfere with Sandoz's broader standing in the marketplace.

92.     Lannett contacted Sandoz's customers to replace Sandoz as the exclusive distributor of Levothyroxine.

93.     In doing so, Lannett made unlawful use of confidential information, namely, Sandoz's contracts with its customers to supply Levothyroxine.

94.     These actions are each individually, and together constitute, unfair methods of competition.

95.     Sandoz has suffered damages resulting from Lannett's interference with its customers, including but not limited to lost profits that Sandoz would have received from the exclusive distribution of Levothyroxine through July 31, 2022 and damage to its goodwill and reputation.

## FOURTH CAUSE OF ACTION

### (Conversion of Confidential Information)

96.     Sandoz incorporates by reference the allegations in paragraphs 1 through 95 above.

97.     Lannett knew that Sandoz distributes Levothyroxine to customers in the United States, including those mentioned above, and that Sandoz has contracts with its customers to supply Levothyroxine.

98.     Sandoz's customer list is confidential information.

99.     Sandoz's business records relating to the distribution and supply of Levothyroxine to customers, including but not limited to data regarding the volumes of customer orders and pricing, are confidential information.

100.     Upon information and belief, as early as June 30, 2020, Lannett contacted Sandoz's customers, claiming to hold distribution rights with Cediprof, and informing them that Sandoz's rights to Levothyroxine had been impaired.

101.     Upon information and belief, Cediprof divulged to Lannett Sandoz's customer lists, information regarding Sandoz's volumes of customer orders, among other confidential information, without Sandoz's consent.  Lannett would have been able to calculate Sandoz's pricing from this information.

102.     Upon information and belief, Lannett used Sandoz's confidential information to contact Sandoz's customers in an attempt to cast doubt on Sandoz's ability to supply products reliably.

103.     Lannett's actions constitute the deprivation of and interference with Sandoz's contractual rights with its customers to supply Levothyroxine.

104.     Sandoz has suffered damages resulting from Lannett's conversion of its confidential information.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff Sandoz respectfully requests that this Court grant Plaintiff a preliminary injunction and temporary restraining order restraining Defendant from contacting Plaintiff's customers and ordering Defendant to immediately cease all marketing and sales activity related to Levothyroxine, and enter judgment in its favor and against Defendant Lannett (i) ordering Defendant to immediately cease contact with Sandoz customers, (ii) ordering Defendant to immediately cease all marketing and sales activity related to Levothyroxine, which

is premised on use of Sandoz's confidential and proprietary information, and (iii) for such

consequential damages, compensatory damages, punitive damages, pre- and post-judgment

interest, attorneys' fees, costs, and further relief as the Court deems just and proper.

Dated:   New York, New York
         July 20, 2020

                                        MORRISON & FOERSTER LLP


                            By:_____/s/ Lisa Phelan_____
                                Lisa Phelan (Attorney ID No. 46969)
                                2000 Pennsylvania Avenue, NW
                                Washington, DC 20006-1888
                                Tel.: (202) 887-1509
                                Email:  LPhelan@mofo.com

                                Jessica Kaufman (*Pro hac vice* pending)
                                Tiffani Figueroa (*Pro hac vice* pending)
                                Michael G. Ahern (*Pro hac vice* pending)
                                250 West 55th Street
                                New York, New York 10019-9601
                                Tel.: (212) 468-8000
                                Email: JKaufman@mofo.com
                                       TFigueroa@mofo.com
                                       MAhern@mofo.com

                                *Attorneys for Plaintiff Sandoz Inc.*