IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SANDOZ INC. | : |
| | : |
| v. | :   CIVIL ACTION NO. 20-3538 |
| | : |
| LANNETT COMPANY, INC. | : |

McHUGH, J.                                                                                           December 28, 2020
**MEMORANDUM OPINION**

This case involves allegations of tortious interference, conversion of confidential information, and unfair competition in the pharmaceutical industry.  Since 2002, Plaintiff Sandoz has exclusively marketed and distributed levothyroxine sodium tablets on behalf of manufacturer Cediprof Inc.  *See* Compl. ¶ 2, ECF No. 1.  Pursuant to a Marketing and Distribution Agreement between the parties, Sandoz is authorized to act as the exclusive distributor of Levothyroxine until July 31, 2022.  *Id.* ¶ 25.  In a separate transaction, Cediprof and Defendant Lannett Company agreed that Lannett would take over the distribution and supply of Levothyroxine once the Sandoz-Cediprof contract ended.  *Id.* ¶ 28.  Levothyroxine generated millions of dollars in revenue for Sandoz in 2019.  *Id*. ¶ 3.

On June 19, 2020, Cediprof attempted to terminate its agreement with Sandoz early, claiming that Sandoz has defaulted.  *Id.* ¶ 4.  Sandoz contends that Cediprof's claims of breach were fabricated.  *Id.*  And importantly for this litigation, Sandoz alleges that Lannett induced Cediprof to pretextually terminate the Sandoz contract in exchange for "significant amounts of money" and an agreement to subsidize Cediprof's litigation expenses against Sandoz.  *Id.* ¶¶ 2, 5.  Plaintiff also claims that Defendant sought to interfere with Plaintiff's customer relationships and did so based on Sandoz's confidential information that Defendant improperly obtained from Cediprof.  *Id.* ¶¶ 53-56.

1

I declined to enter a preliminary injunction, and Lannett now returns with a motion to dismiss. Its filings vociferously contest Plaintiff's factual presentation and offer alternative explanations for its conduct. At this stage of the case, however, I am bound to accept Plaintiff's well-pleaded facts as true. In some respects, Plaintiff's allegations are aggressive, perhaps requiring one to accept a less plausible explanation of events. But given the controlling legal standard, in most respects, Sandoz's complaint survives.

## I. Standard of Review

The well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) governs motions to dismiss under Fed. R. Civ. P. 12(b)(6).

## II. Discussion

### A. Defendant's Alleged Tortious Interference Between Sandoz and Cediprof (Count I)

To state a claim for tortious interference under Pennsylvania law, a plaintiff must plead "(1) a contractual or prospective contractual relationship existed between plaintiff and a third party; (2) defendant took purposeful action, intended to harm that relationship; (3) that no privilege or justification applies to the harmful action; and (4) damages resulted from the defendant's conduct." *E. Rockhill Twp. v. Richard E. Pierson Materials Corp.*, 386 F. Supp. 3d 493, 502 (E.D. Pa. 2019). When analyzing tortious inference claims in this context, Pennsylvania courts have looked to the Restatement (Second) of Torts. *See Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 431–433 (1978) (adopting §§ 766 and 767); *Pawlowski v. Smorto*, 588 A.2d 36, 40 (Pa. Super. Ct. 1991) (applying and interpreting § 774A). I will similarly take the Restatement (Second) as my guide. In this matter, Defendant admits that a contract existed between Plaintiff and Cediprof but charges that Sandoz has not plausibly alleged facts in support of the remaining three elements of its claim. *See* Def.'s Mot. Dismiss 10, ECF No. 41-1.

First, Plaintiff has adequately pled that Defendant acted with the purpose of disrupting the contractual relationship between Sandoz and Cediprof. An actor has the requisite purpose when he is aware that "interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766 cmt. j (1979). *See also Odyssey Waste Services, LLC v. BFI Waste Systems of North America, Inc.*, No. 05-1929, 2005 WL 3110826, at *5 (E.D. Pa. Nov. 18, 2005) (applying cmt. j). Sandoz has claimed that Defendant induced Cediprof to devise a pretextual means of terminating Sandoz's contract early, in exchange for a payment for $20 million. *See* Compl. ¶¶ 27, 67. As evidence of the bargain, Plaintiff has pointed to a clause where Lannett agreed to reimburse thirty percent of Cediprof's legal fees tied to ending its agreement with Sandoz. *Id.* ¶ 28. Though less persuasive, Sandoz has also offered other circumstantial speculation of how Lannett would stand to gain financially from an early termination. *See, e.g., id* ¶ 50. Although Defendant's alternative explanations are certainly plausible,[1] I am obligated to "construe the complaint in the light most favorable to the plaintiff" at the motion to dismiss stage and determine whether the plaintiff may be entitled to relief. *Fowler*, 578 F.3d at 210.

Taking Plaintiff's allegation that Defendant developed a strategy to enable Cediprof to terminate its contract with Plaintiff as true, it naturally follows that Defendant was aware that such conduct would interfere in the contractual relationship between Cediprof and Sandoz. *See Acclaim Systems, Inc. v. Infosys, Ltd.*, No. 13-7336, 2015 WL 4257463, at *4 (E.D. Pa. Jul. 14, 2015) (holding that allegations suggesting that defendant was aware of non-compete agreements but nonetheless caused employees to defect were sufficient to survive a motion to dismiss).[2]

---

[1] Lannett strongly denies that such an agreement to induce termination existed and describes the contested reimbursement provision as a "mundane" feature of pharmaceutical partnership agreements. Def.'s Mot. Dismiss 12 n.3.

[2] Defendant cites *Canfield v. Statoil USA Onshore Props. Inc.*, No. 3:16-0085, 2017 WL 1078184, at *27 (M.D. Pa. Mar. 22, 2017) as persuasive authority in support of dismissal. There, however, the plaintiff's pleadings contained legal conclusions and failed to describe "what wrongful conduct or 'interference' or 'purposeful action' [defendant]

Second, when viewed in the light most favorable to Plaintiff, Defendant's alleged action—soliciting Cediprof to terminate its agreement on pretextual terms—could lack privilege and justification. Pennsylvania courts have applied § 767 of the Restatement (Second) in assessing whether defendants' conduct is justified in inducement cases. *See Adler, Barish,,* 482 Pa. at 432. In applying § 767, the Third Circuit has observed that "[t]he factors [outlined in § 767] … are laden with subjective value judgments that will rarely be answerable as a matter of law." *Avaya, Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 384 (3d Cir. 2016). The Restatement (Second) authors have also cautioned that, in cases where the means utilized to induce a breach are not unlawful, "the desire to accomplish the interference may be more essential to a holding that the interference is improper." *See* Restatement (Second) of Torts § 767 cmt. d.

Plaintiff has claimed that Defendant and Cediprof worked together to concoct the defaults and that Defendant's conduct lacked justification. *See* Compl. ¶¶ 67, 69. In response, Defendant has argued that "to the extent that Lannett interfered with Sandoz's distribution rights, such interference was in pursuit of protecting Lannett's substantial financial stake." Def.'s Mot. Dismiss 16. However, assessing the credibility of this assertion is a fact-intensive inquiry. Given the subjective judgments involved, I cannot hold, as a matter of law, that Defendant's alleged conduct was sanctioned by "the 'rules of the game' which society has adopted." *Empire Trucking Co. Inc. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 935 (Pa. Super. Ct. 2013).

Nor is Defendant shielded by the competition privilege, which involves competition relating to prospective contracts or the decision to continue contracts terminable at will. *See*

---

allegedly engaged in to 'cause' the breach." *Id.* (noting that "Canfield pleads that SNG 'deliberately and without justification' caused SOP to breach the oil and gas lease at issue"). Here, in contrast, Plaintiff has specifically alleged that Defendant paid Cediprof to induce Cediprof to terminate its agreement with Sandoz through pretextual means.

Restatement (Second) of Torts § 768 cmt. h.  With respect to existing contracts, the authors of § 768 note that "when B is *legally obligated to deal with C, A is not justified* by the mere fact of competition in inducing B to commit a breach of his legal duty."  *Id.* (emphasis added).  Plaintiff has averred that Defendant induced Cediprof to breach its legal duty to Sandoz, not that Defendant was barred from seeking to contract with Cediprof after the Sandoz agreement legally expired.  The competition privilege, therefore, does not apply, and Defendant's analogies to cases interpreting § 768 are unpersuasive.[3]  *See Acclaim Systems, Inc.*, No. 13-7336, 2015 WL 4257463, at *4 (E.D. Pa. Jul. 14, 2015) ("[Defendant] is mistaking the standard for interference with *prospective* contractual relations, or for a contract terminable at will, with the standard for interference with *existing* contractual relations") (emphasis in original).

Finally, Sandoz has also sufficiently pled that damages resulted from Defendant's conduct.  In applying § 774(A) of the Restatement (Second), Pennsylvania courts have observed that the requisite damages for tortious interference claims may include "the loss of the benefits of the contract or prospective relation or consequential, emotional or reputational losses resulting from the defendant's conduct."  *Pawlowski*, 588 A.2d at 40.  Sandoz has claimed damages from the loss of the benefits of its contract, alleging that "it will lose tens of millions of dollars in profits that it would have received from the exclusive distribution of Levothyroxine through July 31, 2022."  Compl. ¶ 10.  Plaintiff has also averred that its damages stem from Defendant's successful effort to induce Cediprof to terminate the contract.  These contentions are sufficient to raise an inference that Plaintiff experienced damages as a result of Defendant's action.

---

[3] *See, e.g.*, *Alpha Pro Tech., Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 449 (E.D. Pa. 2013); *Assembly Tech. Inc. v. Samsung Techwin Co.*, No. 09-00798, 2009 WL 4430020, at *4 n.5 (E.D. Pa. Nov. 16, 2009); *BP Envtl. Servs., Inc. v. Republic Servs., Inc.*, 946 F. Supp. 2d 402, 408, 411–412 (E.D. Pa. 2013) (noting that under § 768, "[t]he law recognizes that companies may compete with each other without unlawfully interfering with the other's business relationships"); *Acumed LLC v. Advanced Surgical Servs.*, Inc., 561 F.3d 199, 215 (3d Cir. 2009).

B. <u>Defendant's Tortious Interference Between Sandoz and Its Customers (Count II)</u>

Although Plaintiff has sufficiently pled that Lannett tortiously interfered with its Cediprof contract, I must grant Defendant's motion with respect to Plaintiff's allegations that Defendant interfered with its customer relationships. That is so because the information provided by Lannett was truthful, and so Sandoz has not shown that "that no privilege or justification applies to the harmful action." *E. Rockhill Twp.*, 386 F. Supp. 3d at 502.

Plaintiff broadly alleges that Defendant "contacted Sandoz's customers to inform them that it is now the exclusive distributor of Levothyroxine," which resulted in "discord and confusion." Compl. ¶¶ 12, 53. The complaint suggests that Lannett's outreach began around June 30, 2010 and consisted of outreach to three customers. *Id.* ¶ 58. The communications included representations to the customers that Sandoz's rights to Levothyroxine had been "impaired." *Id.* ¶ 12. One customer contacted Sandoz on July 9, 2020 to report that "[they] heard from Lannett that they will be taking over your Levothyroxine in the next few weeks." *Id.* ¶ 62.

Taking Plaintiff's allegations as true, Defendant's alleged inference with Plaintiff's customers was not improper because Defendant's statements during its outreach were truthful. Pennsylvania has adopted § 772 of the Restatement (Second), which provides that "[t]here is of course no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another." *Walnut St. Associates, Inc. v. Brokerage Concepts, Inc.*, 610 Pa. 371, 389 (2011) (adopting § 772). The information need not be solicited. *Id.* at 389. Moreover, the statement is protected even if the "person to whom the information is given immediately recognizes them as a reason for breaking his contract or refusing to deal with another." *Id.* at 389.

6

As Sandoz pleads, Cediprof attempted to terminate its agreement with Sandoz, effective July 31, 2020. As a result, the two specific statements that Sandoz references in its complaint—Defendant's representation around June 30, 2020 that Sandoz's rights had been impaired, and that Defendant would take over Sandoz' distribution rights—were true. Because Sandoz does not include any other specific statements, it is only those two communications that can be considered the source of the "discord and confusion" alleged. It is true that customers would recognize the information Defendant provided as a reason to cease dealing with Sandoz with respect to Levothyroxine, but the Pennsylvania Supreme Court explicitly contemplated this possibility in *Walnut St. Associates.* 610 Pa. 371 at 389. Accordingly, I cannot hold that Defendant's statements were improper with respect to Sandoz's contracts with its customers, and I will grant Defendant's motion to dismiss this claim.

  C. <u>Defendant's Alleged Conversion of Confidential Information (Count IV)</u>

Sandoz also contends that Cediprof divulged Plaintiff's customer lists and information regarding sales volume, which allowed Defendant to calculate Sandoz's pricing. *See* Compl. ¶ 101. Pennsylvania recognizes a claim for conversion of business information in accordance with the Restatement (First) of Torts § 759 (1939). That section provides that "one who for the purpose of advancing a rival business interest, procures by improper means information about another's business is liable to the other for the harm caused by his possession, disclosure or use of the information." *Id.* Under Pennsylvania law, "[i]nformation that is procured under this section need not rise to the level of a trade secret. It only need be confidential business information." *Pestco, Inc. v. Assoc. Prod., Inc.,* 880 A.2d 700, 709 (Pa. Super. Ct. 2005). Although the relationship between the wrongful conduct Sandoz pleads and the harm it claims is not entirely clear, at this stage it has nonetheless stated a claim.

*1. Procuring Information Through Improper Means*

Defendant first argues that Sandoz fails to plausibly support its claim that Lannett used or possessed its business information. *See* Def.'s Mot. Dismiss 23. I cannot agree. Sandoz has claimed that 1) Cediprof had access to the information at issue; 2) that Cediprof divulged information to Lannett regarding Sandoz's customer lists and volumes of customer orders, without Sandoz's consent; and that 3) Lannett utilized this information in its in outreach to Sandoz's customers. *See* Compl. ¶¶ 101, 102. Lannett counters that it acquired this information from its own efforts, *see* Def.'s Mot. Dismiss 26, but I must credit Plaintiff's version of events at this stage of the litigation. *See Fowler*, 578 F.3d at 210. Based on the evidence presented, Plaintiff has plausibly alleged that Lannett acquired its customer lists and sales volume data through Cediprof.

Sandoz argues that dissemination was improper, as the information at issue came within the scope of its confidentiality agreement with Cediprof and Sandoz did not consent for its information to be shared with a competitor. *See* Compl. ¶ 101. Courts within this circuit have held that receiving or passing information in violation of a confidentiality agreement may constitute improper means under § 759. *See, e.g.*, *Teva Pharmaceuticals USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 680–81 (E.D. Pa. 2018) (Savage, J.) (holding that employee procured information by improper means when she accessed and copied confidential information, in violation of a confidentiality agreement and disclosed it to a competitor"). Cediprof's confidentiality agreement with Sandoz protects "any information or data" pertaining to either entity's "products," "costs," and "customers," among other topics. *See* Def.'s Mot. Dismiss Ex. 3 at 23, ECF No. 41-5. These terms unambiguously protect customer names that Sandoz shared with Cediprof, although it is important to note that Lannett contests that it acquired this information through Cediprof in the first instance.

Defendant claims that sales volume information is unprotected by the confidentiality agreement, but I find that the agreement is ambiguous with respect to its coverage. *See In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996) ("Whether a document is ambiguous presents a question of law properly resolved by this court"). The parties did not explicitly protect "sales" information, which is telling, but the "customers" term could also be reasonably construed to the address purchases made by those customers. Once a document is found to be ambiguous, extrinsic evidence may be considered to clarify its meaning. *Id.* at 150. At this stage, given that the claim will otherwise proceed, I am not prepared to rule on the scope of protection conferred by the agreement until the record is more fully developed.

2. *The Confidential Nature of the Information*

In general, customer lists and sales volume information may constitute confidential business information under § 759. *See Pestco*, 880 A.2d at 709 (affording protection under § 759 for bills of lading that include the name of the customer and information as to quantities ordered); *Pierre & Carlo, Inc. v. Premiere Salons, Inc.*, 713 F.Supp 2d 471, 482 (E.D. Pa. 2010) (stating that plaintiff had "established a likelihood that it considered its customer lists confidential business information"); *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1229, 1231 (Pa. Super. Ct. 1989) (noting that "sales and profit margins on a product-by-product basis" falls within the definition of confidential business information). Some courts have even held that customer lists may qualify as a trade secret in some circumstances. *See, e.g.*, *American Ice Co. v. Royal Petroleum Corp.*, 261 F.2d 365, 367 (3d Cir. 1958) (observing that "Pennsylvania law has recognized customer data of the kind involved here as confidential and highly valuable information entitled to protection as a trade secret").

Information that enables a party to ascertain a rival's pricing methods can also be confidential. *See Den-Tal-Ez Inc.*, 566 A.3d at 1230. Indeed, as the Third Circuit observed, "to the extent that knowledge of alternate suppliers of these bearings, and their respective prices, was dependent on knowing the secret specifications, this information would seem to be secret as well." *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1257 (3d Cir. 1985). Plaintiff may show that the results of its pricing methodology are confidential if it demonstrates that the underlying informational inputs are confidential. *Id.*[4]

Plaintiff and Defendant strongly dispute whether Lannett obtained information through its own efforts or through Cediprof. Yet again I must construe the complaint in the light most favorable to Plaintiff. Sandoz has alleged that it considered its customer information and its business records relating to customer data and pricing as confidential. Sandoz also made efforts to protect at least some of this information through its confidentiality agreement with Cediprof. These allegations are sufficient to state a claim under existing Pennsylvania law, as construed by federal and state courts. *See e.g., Pestco*, 880 A.2d at 709 (crediting statements that information was "confidential" and would not be given to a competitor); *Teva Pharmaceuticals USA, Inc.*, 291 F.Supp.3d. at 681, 657 (noting that an allegation that an individual improperly acquired information that was not available outside of the company, where company took measures to protect it, was sufficient to state a claim). The alternative factual scenarios advanced by Lannett are not properly considered at this stage.

---

[4] If, however, pricing information can be obtained from non-confidential sources, it falls outside the realm of protection. *See Brett Senior & Assocs. v. Fitzgerald*, No. 06-1412, 2007 WL 2043377, at * 7 (E.D. Pa. July 13, 2007).

3. *Existence of Damages*

Under § 759, Plaintiff must also show that harm [was] caused by [the defendant's] possession, disclosure or use of the information." *Pestco,* 880 A.2d at 708–09. Sandoz primarily alleges that Lannett improperly made use of Plaintiff's information and contacted its customers, thereby damaging its "goodwill and reputation in the marketplace" because Lannett "cast doubt on Sandoz's ability to supply products reliably." Compl. ¶¶ 12, 102. Sandoz also broadly claims that "Lannett began taking actions to harm Sandoz's relationships with its clients, engaging in dishonest, unfair, and improper conduct through the wrongful means of making misrepresentations and exerting unfair economic pressure on these customers." *Id.* ¶ 57. Finally, with reference to the conversion claim, it specifically claims damages. *Id.* ¶ 104.

Although Sandoz's pleadings lack detail, its allegations regarding the impact on its customer relationships are sufficient at this early stage of the case. The motion to dismiss will be denied.

D. Unfair Competition Claim (Count III)

Under Pennsylvania law, a common law unfair competition claim is relatively broad in scope and is not limited to the misappropriation of trade secrets. *See Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 867 (Pa. Super. Ct. 1998) ("A claim of unfair competition encompasses trademark infringement, but also includes a broader range of unfair practices, which may generally be described as a misappropriation of the skill, expenditures and labor of another"). Against the background of that broad description from the Superior Court, a panel of the Third Circuit has observed, "the contours of Pennsylvania unfair competition law are not entirely clear." *Checker Cab Philadelphia, Inc. v. Uber Technologies, Inc.*, 689 Fed. App'x. 707, 709 (3d Cir. 2017). Federal courts within the Third Circuit have relied upon the Restatement (Third) of Unfair

11

Competition § 1 definition, *see Synthes (U.S.A.) v. Globus Medical Inc.,* No. 04-1235, 2005 WL 2233441 at *9 (E.D. Pa. Sept. 14, 2005), but Pennsylvania appellate courts have yet to address it. *See Checker Cab*, 689 Fed. Appx. at 710.

Plaintiff largely contends that if its "pleadings of tortious interference and conversion of confidential information are sufficiently pled, so is [its] unfair competition claim." Pl.'s Opp'n at 28, ECF No. 44. This statement appears predicated in part on comment (g) of § 1, which observes that, "[a]s a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition." Restatement (Third) of Unfair Competition § 1 cmt. g (1995). But this formulation, if adopted, "would render unfair competition claims duplicative and entirely redundant" with other tortious business conduct. *See Autotrakk, LLC v. Automotive Leasing Specialists, Inc.*, No. 4:16-01981, 2017 WL 2936730 at *13 (E.D. Pa. Jul. 10, 2017). Moreover, the leading authority for Plaintiff's position, *Synthes (U.S.A.),* 2005 WL 2233441, at *9, has been criticized for endorsing a broad formulation of unfair competition that is unsupported by existing Pennsylvania precedent. *See Autotrakk*, 2017 WL 2936730, at *13. In the absence of further guidance from Pennsylvania courts,[5] I hesitate to adopt Plaintiff's sweeping assertion that a claim for tortious interference will always give rise to a claim for unfair competition.

Nonetheless, I find that the nature of Lannett's alleged conduct, which includes inducement of a third-party (Cediprof) to breach its agreement with Sandoz and turn over confidential information, sufficiently resembles conduct prohibited as unfair competition by Pennsylvania

---

[5] It is far from clear that the Pennsylvania Supreme Court would endorse the Restatement in its entirety, given the misgivings it expressed in *Tincher v. Omega Flex, Inc.*, 628 Pa. 296, 338 (2014), where it stated that it is "difficult to imagine a modern court simply adopting something so broad-based and legislative in character as an outside organization's Restatement of Law".

courts. Businesses have been held liable for unfair competition in the employment context for soliciting employees with non-compete or non-solicitation agreements and inducing those employees to violate those agreements. In one such case, a defendant hired two top performing sales representatives of a rival radio station, in violation of their non-compete agreements. *See Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211–212 (Pa. Sup. Ct. 2003). The appellate court held that the defendant's action could constitute tortious inference. *Id.* It also observed that this conduct could also amount to unfair competition where "the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers." *Id.* at 212. Similarly, in *B.G. Palmer & Co., Inc v. Frank Crystal & Company, Inc.*, the Superior Court upheld an award of punitive damages for tortious interference and unfair competition, among other claims, against a defendant that had induced a competitor's sales team to join its business and solicit former clients, in violation of a non-compete agreement. 148 A.3d 454, 465–467 (Pa. Sup. Ct. 2016). *See also Albee Homes, Inc. v. Caddie Homes, Inc.*, 417 Pa. 177, 186 (1965) (observing in the context of contract that a business's action to induce a competitor's employees to terminate their contracts and work for the business in a similar area constituted "wrongful conduct").

Sandoz has similarly alleged that Lannett induced Cediprof to engage in wrongful conduct by concocting reasons to terminate its agreement with Sandoz. I also find it relevant that Sandoz has averred that Lannett persuaded Cediprof to provide it with confidential information in violation of its agreement with Sandoz. Taken together, these allegations sufficiently resemble conduct that Pennsylvania courts have deemed unfair competition, even if the claims overlap to some extent.

**III.     Conclusion**

For the reasons set forth above, Defendant's Motion to dismiss Plaintiff's Complaint will be granted in part and denied in part. An appropriate order follows.

s/Gerald Austin McHugh
United States District Judge
