IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SANDOZ INC. : | |
| : | |
| v. : | CIVIL ACTION NO. 20-3538 |
| : | |
| LANNETT COMPANY, INC. : | |

**McHUGH, J.**                                                                                                                                      **June 17, 2021**
**MEMORANDUM**

    This matter involves claims of unfair competition and tortious interference between two pharmaceutical companies. Since 2002, Sandoz has contracted with Cediprof, a drug manufacturer, to serve as the exclusive distributor and marketer of Cediprof's levothyroxine sodium tablets. Sandoz's rights were set to expire on July 31, 2022, when Cediprof planned to transition its levothyroxine to Lannett, a rival distributor. But on June 19, 2020, Cediprof terminated its agreement with Sandoz, claiming Sandoz had defaulted on its obligations. Lannett then began distribution of levothyroxine on August 1, 2020, two years earlier than it had expected.

    Sandoz responded by filing suit against Cediprof in federal court and pursuing arbitration. It separately commenced this action against Lannett, alleging that Lannett had wrongfully induced Cediprof's cancellation of the agreement. Lannett responded with a counterclaim against Sandoz, averring that Sandoz has engaged in tortious interference and unfair competition. Sandoz has filed a motion to dismiss Lannett's counterclaims, which I will deny in full, applying many of the same principles invoked in denying Lannett's earlier motion to dismiss claims brought by Sandoz.

**I.**     **Standard of Review**

    Within the Third Circuit, motions to dismiss under Fed. R. Civ. P. 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

1

II.     **Discussion**

A. Unfair Competition

In the Third Circuit's view, "[i]t is not so easy to conclude that there is one narrow and clear category of the common law tort" of unfair competition.  *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995).  The claim "encompasses trademark infringement, but also includes a broader range of unfair practices, which may generally be described as a misappropriation of the skill, expenditures and labor of another." *Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 867 (Pa. Super. Ct. 1998).  Earlier in this litigation, I rejected the argument that tortious interference comprises unfair competition *per se*. *See* ECF 49 at 12.  I nonetheless held that Sandoz had stated an unfair competition claim, because its allegations resembled conduct prohibited as unfair competition by Pennsylvania courts. Lannett's counterclaim also survives on this basis.

Lannett contends that Sandoz made a series of misleading statements to its levothyroxine customers and abridged Lannett's exclusivity rights by continuing to sell levothyroxine after July 31, 2020.  *See* Counterclaim ¶ 4, ECF 54.  Sandoz allegedly suggested to its customers that hurricane season would put Cediprof's levothyroxine supply at risk, *id.* ¶ 31, that Lannett did not own the distribution rights to levothyroxine, *id.* ¶ 32, and that, given these concerns, customers should re-bid their business rather than switch to Lannett. *Id.* ¶¶ 8, 30.  The parties further dispute whether Sandoz's ongoing sales violate the Cediprof-Sandoz agreement, which allegedly bars Sandoz from distributing levothyroxine for the four-year period following its for-cause termination. *Id.* ¶ 4.

Under Pennsylvania law, the common law tort of unfair competition encompasses misleading statements and the usurpation of competitors' product rights.  The Pennsylvania

2

Supreme Court has stated that to allow "false and misleading representations" in outreach to customers is to "countenance unfair competition." *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 415 Pa. 276, 284 (1964). *See also Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 364 (1960) (describing unfair competition where "the defendants' action consist[ed] of … fraud or deception in its dealings with third parties or consumers"). The Court has also acted to safeguard exclusive product rights, finding that a competitor's efforts to "pirate" a media company's news product without authorization involved violations of property rights and unfair competition. *See Pottstown Daily News Pub. Co. v. Pottstown Broadcasting Co*, 411 Pa. 383, 394 (1963) (observing that "the protection which the law affords to competition does not and should not countenance the usurpation of a competitor's investment and toil"). These precedents support the conclusion that Sandoz's alleged activities, which include unauthorized sales of levothyroxine and false statements to customers, may constitute unfair competition under Pennsylvania law.[1] Because questions of fact remain regarding the truth and accuracy of Sandoz's statements and the extent of Lannett's exclusivity rights, I will deny Sandoz's motion to dismiss.

B. Tortious Interference

To state a claim for tortious interference with prospective contractual relations, a plaintiff must plead: (1) a prospective contractual relationship; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part

---

[1] Sandoz argues that this Court must dismiss the unfair competition counterclaim on the ground that it is "entirely duplicative of [the] tortious interference claim." Mem. L. Supp. Mot. Dismiss 16, ECF No. 63-1. For this proposition, it cites *Dietrich & Assocs., Inc. v. Neison*, No. CV 18-5034, 2020 WL 3488343, at *9 (E.D. Pa. June 26, 2020). *Dietrich* is distinguishable, however, as it applied the "gist of the action" doctrine, which "bars tort claims against contracting parties where the claim is, in actuality, a claim against the party for breach of its contractual obligations." *Id.* (internal punctuation and citations omitted). This doctrine does not apply here, because the parties do not allege the existence of a contract between Lannett and Sandoz.

3

of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct. *Glenn v. Point Park College*, 441 Pa. 474, 479-480 (1971).

1. Prospective Contractual Relationship

A prospective contractual relationship is "something less than a contractual right, something more than a mere hope." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 209 (1979). The standard is an objective one, namely, whether the evidence demonstrates a "reasonable probability" that a contract would have arisen absent the defendant's interference. *Id.* at 209–210 (quoting *Glenn*, 441 Pa. at 480–481). The reasonableness of the plaintiff's expectation generally involves questions of fact. *See KBT Corp v. Ceridian Corp.*, 966 F.Supp. 369, 376 (E.D. Pa. 1997). To show a prospective relationship, plaintiffs may identify specific customer relationships or a mechanism through which the plaintiff would ordinarily secure new contracts. *Id.*

Lannett claims that Sandoz interfered with its efforts to contract with prior purchasers of Cediprof's levothyroxine. It alleges that, after "reach[ing] out to customers offering to supply their levothyroxine needs," it received inquiries regarding its disaster preparation plans and whether it owned the distribution rights to Cediprof-manufactured levothyroxine. Counterclaim ¶¶ 31, 32. These nascent outreach efforts, standing alone, would not support a reasonable expectation of a contract. *See Solid Wood Cabinet Co. v. Partners Home Supply*, No. 13-3598, 2015 WL 1208182, at *9 (E.D. Pa. Mar. 13, 2015) (stating that the opportunity to make an offer does not create a prospective contractual relation, without evidence that it was reasonably probable that plaintiff would have been the winning bidder); *Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. 01-4254, 2002 WL 31246922, at *13 (E.D. Pa. Aug. 9, 2002) (commenting that the allegation that plaintiff "was developing future or prospective business relationships" did not serve as a basis to conclude that

there was "an objectively reasonable probability that [such relationships would] come into existence").

But Lannett's counterclaim may survive a motion to dismiss if it can show a network of relationships through which contracts would ordinarily arise. This logic is exemplified by *Posner v. Lankenau Hosp.*, 645 F.Supp. 1102, 1112 (E.D. Pa. 1986), where a doctor alleged that defendants had interfered with his ability to obtain patients through existing referral and consultation patterns at the hospital. The district court denied the motion to dismiss, observing that the plaintiff had adequately described existing networks, and should have the opportunity "to prove at trial that there were specific patients which other doctors would have referred to him if he had remained at [the hospital]." *Id* at 1112 n.6. *See also Liberty Mutual Insurance Company v. Gemma*, 301 F.Supp.3d 523, 543–544 (W.D. Pa. 2018) (permitting tortious interference claim where plaintiff had a relationship with a real estate company that would refer customers to plaintiff). *Cf. Giampolo v. Somerset Hosp. Center for Health, Inc.*, No. 95–133J, 1998 WL 608243, at *14 (W.D. Pa. May 29, 1998) (dismissing claim on the ground that the plaintiff had failed to develop evidence of hospital referral and consultation patterns and had not identified a single patient that would have been referred to him absent defendant's alleged conduct).

The particular nature of levothyroxine as a medication, and Lannett's exclusive rights to distribute Cediprof's levothyroxine, arguably create a mechanism through which Lannett would naturally secure Sandoz's customers. Levothyroxine is a "narrow therapeutic index" drug, meaning that small variations in the manufacturing process may impact the way the drug impacts a patient. Counterclaim ¶ 23. For this reason, purchasers of Cediprof-manufactured levothyroxine could conceivably have a strong incentive to remain with the same manufacturer to ensure consistent results for patients. *Id.* ¶ 24. Sandoz disrupted this pipeline, Lannett claims, when it

contacted at least two customers to cast doubt on Lannett's ability to reliably supply Cediprof-manufactured levothyroxine and when Sandoz continued to sell its levothyroxine stock, in alleged violation of Lannett's exclusivity rights and the Sandoz-Cediprof agreement. *Id.* ¶¶ 4, 31, 32. These allegations concerning the nature of levothyroxine and Lannett's distribution rights raise questions of fact regarding the reasonableness of Lannett's expectations. But, as in *Posner*, I am persuaded that Lannett should have the opportunity to prove its claims. *See* 645 F.Supp. at 1112.

2. Purposeful Action

In addition to showing a prospective contractual relation, Lannett must also demonstrate that Sandoz took "purposeful action … specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring." *Acumed LLC v. Advanced Surgical Services, Inc.*, 561 F.3d 199, 212 (3d Cir. 2009). Pennsylvania courts have looked to § 766B of the Restatement (Second) of Torts when evaluating whether the defendant took purposeful action. *See International Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1274 (Pa. Super. Ct. 2012). The Restatement provides that a defendant's interference is deemed intentional when "the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766B cmt. d (1979).

Lannett has alleged that Sandoz engaged in at least four acts of interference: continuing to sell inventory despite Lannett's exclusive rights, Counterclaim ¶ 27; urging customers to re-bid their business rather than switch to Lannett, *id.* ¶ 30; suggesting to customers that the hurricane season would put Cediprof's levothyroxine supply at risk, *id.* ¶ 31; and implying that Lannett did not own the distribution rights to Cediprof's levothyroxine, *id.* ¶ 32. At the motion to dismiss stage, I must "assume all remaining factual allegations to be true, construe those truths in the light

most favorable to the plaintiff, and then draw all reasonable inferences from them." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). Viewed in this manner, Sandoz's alleged statements regarding the impact of hurricane season, Lannett's distribution rights, and re-bidding business appear to have been made with the knowledge that a Sandoz customer, upon receiving this information, would be less inclined to transition its business to Lannett. This meets the standard of purposeful action under the Restatement. Sandoz's continued levothyroxine sales also satisfy the Restatement standard, in that Sandoz was undoubtedly aware that continued competition in the Cediprof-manufactured levothyroxine market would hinder Lannett's attempts to procure Sandoz's customers.

3. Privilege

In Pennsylvania, the plaintiff must demonstrate a lack of privilege or justification as part of the prima facie case of tortious interference, and failure to do so results in dismissal of the claim. *See Thompson Coal Co.*, 488 Pa. at 208 n.7. "What is or is not privileged conduct in a given situation is not susceptible of precise definition." *Adler, Barish, Daniels, Levin, and Creskoff v. Epstein,* 482 Pa. 416, 432–433 (1978). To guide their analysis of privilege, Pennsylvania courts generally look to the set of factors delineated by § 767 of the Restatement (Second) of Torts. *Id.* at 433. Conduct may also acquire privilege if the actor has engaged in justified competition, *see* Restatement (Second) of Torts § 768, or if the statements are truthful or are offered as honest advice, *see id.* § 772(a).

a. Privilege Under § 767

The factors listed in § 767 include:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the

> contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663 (3d Cir. 1993) (internal citations omitted). The Third Circuit has further observed that "[t]he factors [outlined in § 767] … are laden with subjective value judgments that will rarely be answerable as a matter of law." *Avaya, Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 384 (3d Cir. 2016).

Lannett has identified four alleged acts of interference which it claims are unprivileged: continuing to sell inventory despite Lannett's exclusive rights, Counterclaim ¶ 27; urging customers to re-bid their business rather than switch to Lannett, *id.* ¶ 30; suggesting to customers that the hurricane season would put Cediprof's levothyroxine supply at risk, *id.* ¶ 31; and implying that Lannett did not own the distribution rights to Cediprof's levothyroxine. *Id.* ¶ 32. Lannett has further pleaded that Sandoz "intentionally sought to harm Lannett by falsely suggesting that Lannett would be unable to reliably supply product." *Id.* ¶ 8. Fraudulent representations are ordinarily unprivileged under § 767, and Lannett's pleadings raise questions of fact with respect to the truthfulness of Sandoz's statements. *See* Restatement (Second) of Torts § 767 cmt. c (1979). And, as previously discussed, actions that amount to unfair competition and "the usurpation of a competitor's investment and toil," *Pottstown Daily News Pub. Co.*, 411 Pa. at 394, are improper and weigh against a finding privilege. Because I cannot hold that Sandoz's alleged actions were privileged as a matter of law under § 767, I must also examine the applicability of §§ 772(a) and 768.

  b. <u>Privilege Under § 772(a)</u>

Pennsylvania has adopted § 772(a) of the Second Restatement, which provides that truthful statements or "honest advice within the scope of a request for advice" are not actionable. *Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.*, 610 Pa. 371, 388 (2011). To qualify as "honest

8

advice," the Restatement requires "(1) that advice be requested, (2) that the advice given be within the scope of the request and (3) that the advice be honest."  Restatement (Second) of Torts § 772(a) cmt. c (1979).  Sandoz claims that two of its alleged statements are protected as honest advice:  its claim that the upcoming hurricane season *might* put Lannett's levothyroxine supply at risk, as well as the statement that Lannett lacked the right to distribute levothyroxine.  *See* Mem. L. Supp. Mot. Dismiss 10–12.  Such determinations regarding privilege are premature, as the parties strongly dispute whether Sandoz's statement arose in response to a request for advice or whether Sandoz proactively informed customers of the potential dangers to Lannett's supply.  Discovery will be necessary to ascertain the context in which Sandoz's alleged statements were made.

Nor can I conclude at this early stage that Sandoz's comments regarding the risks of hurricane season and Lannett's distributor rights were privileged as truthful.  When the facts are viewed in the light most favorable to Lannett, the hurricane statement implies that Lannett's supply of levothyroxine could become compromised during the hurricane season.  The existence of the caveat "might" does not neutralize the statement's negative implication,[2] and the parties strongly dispute the extent of the risk to the supply, with Lannett pleading that the risk was negligible due to Cediprof's existing emergency plans.  Unlike *Walnut Street Associates, Inc.*, 610 Pa. at 375, where there was "no dispute" that the information was truthful, questions remain in this case with respect to the actual risk that hurricanes posed to Cediprof's facilities.

Sandoz also allegedly informed its "levothyroxine customers that Lannett had improperly induced Cediprof to terminate its agreement with Sandoz and that Lannett did not, in fact, have the rights to distribute Cediprof's levothyroxine."  Counterclaim ¶ 32.  Sandoz again claims that

---

[2] I am further persuaded by the fact that in defining "truthful information," § 772(a) refers to § 581 of the Restatement (Second), which describes the protection afforded to true statements in the context of defamation.  Pennsylvania courts have found true statements actionable when they raise false inferences. *See Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6, 14 (Pa. Super. Ct. 1982).

its assertion was truthful, as it certified its "position that Lannett had improperly induced Cediprof to terminate its agreement with Sandoz" when it filed for a temporary restraining order action on July 20, 2020. *See* Mem. L. Supp. Mot. Dismiss 12. But this statement again falls outside of § 772's ambit. The fact that an allegation is public or filed in court does not render the substance of the allegation truthful or within the scope of honest advice. The parties' rights are presently undetermined, and as the statement at issue is devoid of clarifying context, I cannot conclude that repeating the allegations at issue in this litigation constitutes "truthful" information.

    c. <u>Privilege Under § 768</u>

Pennsylvania has also adopted § 768 of the Restatement (Second) of Torts, which recognizes that competitors, in certain circumstances, are privileged in the course of competition to interfere with others' prospective contractual relationships. *See Gilbert v. Otterson*, 550 A.2d 550, 554 (Pa. Super. Ct. 1988). Section 768 provides that:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>     (a) the relation concerns a matter involved in the competition between the actor and the other and
>     (b) the actor does not employ wrongful means and
>     (c) his action does not create or continue an unlawful restraint of trade and
>     (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768.

Preliminarily, I find that Sandoz and Lannett qualify as competitors within the meaning of the Restatement. *See* Restatement (Second) of Torts § 768 cmt. c (1979) (stating that a court may find competition regardless of "whether the actor and the person harmed are competing as sellers or buyers or in any other way, and regardless of the plane on which they compete"). The Third Circuit has recognized a distributor and a former distributor as competitors under § 768, even when the former distributor was precluded from selling within a certain territory. *Acumed*, 562 F.2d at

207-208, 215.  Given the analogous facts in this case and the ongoing sales of levothyroxine, *Acumed* supports a finding of competition as a matter of law.[3]  I am also persuaded by the fact that Lannett has counterclaimed for unfair competition, alleging that Sandoz's customer outreach and sales of levothyroxine reduced its market share.  *See* Counterclaim ¶¶ 1, 9, 11.

I also conclude that Sandoz's conduct furthered its competitive interest.  As the drafters of the Restatement (Second) observe, "[i]f the business diverted by the actor relates to his competition with his competitor, his conduct will ordinarily be directed, at least in part, to the improvement of his position in the competition."  *See* Restatement (Second) of Torts § 768 cmt. g (1979).  Sandoz's continued customer outreach and levothyroxine sales helped it preserve its market share and customer relationships vis-à-vis Lannett, which satisfies the requirements of § 768.

At issue here is whether Sandoz employed wrongful means.[4]  Conduct is "wrongful" when it is "actionable for a reason independent from the claim of tortious interference itself."  *Acumed* 561 F.3d at 215 (invoking examples from § 768 of "physical violence, fraud, civil suits and criminal prosecutions").  *See also Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849, 857 (3d Cir. 2000) (citing persuasive authority that "wrongful means" is "conduct which is itself capable of forming the basis for liability of the actor") (internal citation and quotation marks omitted).  The myriad factual issues in this case preclude a finding of privilege under § 768 as a matter of law.  Lannett alleges Sandoz made false or misleading statements to customers, and these

---

[3] Lannett argues that it is not a competitor, citing *Pino v. Prudential Ins. Co. of Am.*, 689 F. Supp. 1358, 1362 (E.D. Pa. 1988) and *Techno Corp. v. Dahl Assocs.*, 535 F. Supp. 303, 307 (W.D. Pa. 1982).  In *Pino*, the entities did not operate in the same industry (insurance policy sales). *See* 689 F.Supp. at 1362.  In *Techno Corp*, one party served as a middleman sales agent while the other operated as a manufacturer. *See* 535 F.Supp. at 307.  The parties overlap more extensively in this case, as Lannett has alleged Sandoz continues to distribute levothyroxine.  *See* Counterclaim ¶ 27.

[4] Lannett does not appear to allege that Sandoz's conduct restrained trade.  *See* Restatement (Second) of Torts § 768(c).

11

claims could theoretically give rise to independent causes of action for fraud, commercial disparagement, defamation, or under the Pennsylvania Unfair Trade Practices and Consumer Protection Law. And, as discussed previously, Sandoz's alleged abridgment of Lannett's exclusivity rights is actionable as unfair competition. *See Pottstown Daily News Pub. Co.*, 411 Pa. at 394 (stating that "the protection which the law affords to competition does not and should not countenance the usurpation of a competitor's investment and toil"). [5]

4. Actual Damages

Lannett has sufficiently pleaded actual damages. In applying § 774(A) of the Restatement (Second), Pennsylvania courts have observed that the requisite damages for tortious interference claims may include "the loss of the benefits of the contract or prospective relation or consequential, emotional or reputational losses resulting from the defendant's conduct." *Pawlowski v. Smorto*, 588 A.2d 36, 40 (Pa. Super. Ct. 1991). Lannett has averred that it has lost millions of dollars in profits as a result of Sandoz's continued sales of Cediprof's levothyroxine and its misleading comments to potential customers. *See* Counterclaim ¶ 10. These contentions are sufficient to raise an inference that Lannett has experienced damages due to Sandoz's actions.

**III. Conclusion**

For the reasons set forth above, Sandoz's Motion to Dismiss Lannett's Counterclaim will be denied. An appropriate order follows.

    /s/ Gerald Austin McHugh
    United States District Judge

---

[5] Sandoz analogizes to *Acumed*, where the Third Circuit held that the defendant's refusal to return inventory following the termination of a distributorship agreement, as well as subsequent sales of that inventory, did not constitute wrongful means. *See* 561 F.3d at 220. In so holding, the Third Circuit recognized that the conduct at issue, while transgressing industry norms, did not "violate any principle of statutory or common law of which we are aware." *Id.* This case is distinguishable because I have established that Sandoz's sales may give rise to a cause of action for unfair competition.